IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | |
| | * | |
| BILLY WESSON, | * | CRIMINAL NO. CCB-21-0398 |
| | * | |
| Defendant. | * | |
| | * | |
| ******* | | |

GOVERNMENT'S CONSOLIDATED RESPONSE
TO DEFENDANT'S PRE-TRIAL MOTIONS

The United States of America respectfully submits this consolidated response to the motions filed by Defendant Billy Wesson in this matter. ECF Nos. 28-32. For the reasons that follow, the Court should deny the motions.

FACTUAL BACKGROUND

**I.     August 4, 2020 Robbery.**

On August 4, 2020 at approximately 9:06 pm, Wesson and a co-conspirator robbed the Royal Farm store located at 3701 Fleet Street Baltimore, Maryland 21224. When they entered the store, Wesson—who was wearing New Balance sneakers—displayed a blue and silver firearm and ran after the cashier who, upon seeing the robbers, began to run to the rear of the store. Still images taken from the surveillance footage that show Wesson's New Balance sneakers and the silver and blue firearm are below.





The robbers chased after the cashier, caught up with her, and walked her over to the cash register area. She opened the register at gunpoint, and the robbers took cash from the drawer. They then fled.

## II.     August 6, 2020 and August 7, 2020 Robberies.

Two days later, on August 6, 2020 at approximately 11:50pm, Wesson and a co-conspirator robbed the Royal Farm store located at 206 West Coldspring Lane, Baltimore, Maryland 21210. Wesson, who was again carrying the blue and silver firearm, entered the stored and placed the firearm to the back of the cashier's head and walked her to the register area. He ordered her to

open the register, which she did. He then took money from the drawer, before fleeing with his co-conspirator. Still images taken from the surveillance footage that show the silver and blue firearm being held by Wesson (whose tattoo on his right hand is also visible) are below.



On August 7, 2020 at 12:36am—less than an hour after the robbery of the Royal Farms located at 206 West Coldspring Lane—Wesson and a co-conspirator robbed the Royal Farm store located at 3635 Keswick Road, Baltimore, Maryland 21211, which is approximately 1.2 miles away from 206 West Coldspring Lane.

The victim employee advised that the first suspect—Wesson—described as a black male, 18 years old, 5-7", dark clothing, brandished a multicolored blue handgun and ordered him to open the cash register. She did so, and after obtaining money from the register, Wesson fled the store with his co-conspirator.

### III. Wesson's August 8, 2020 Arrest And The Recovery Of Drugs And The Firearm Used During The Earlier Robberies.[1]

---

[1] The Government expects the following facts to be established at the motions hearing set for May 26, 2022 by means of testimony and body-worn camera footage.

Page 3 of 18

On the evening of August 8, 2020, at approximately 10:53 PM, four Baltimore Police Department officers were conducting routine patrol in an unmarked vehicle on the 5100 block of Midwood Avenue in the Winston-Govans neighborhood in Northwest Baltimore—a residential neighborhood in an area frequented by individuals involved in the sale of controlled dangerous substances and in which drug and firearm arrests frequently occur. At the time, there was a party in the area of the 5100 block of Midwood Avenue, and there were multiple individuals in the street and on the sidewalk.

The officers—all of whom were in uniform—saw an individual later identified as Defendant wearing a satchel[2] across the right side of his body. It appeared to contain something heavy. Moreover, the officers saw Defendant conduct a "security check"—*i.e.*, an instinctive check by an armed person suspect to see that his weapon was in place—by grabbing the bottom of the satchel. Defendant was likewise in the area of an automobile.

Suspecting that Defendant was armed, the officers stopped their car and began to get out of it so that they could approach Defendant. Seeing the officers get out of their car, Defendant immediately ran Southbound on Midwood Avenue—in the opposite direct of the officers whose car was headed northbound on the street. Each of the four officers pursued him. As he ran from the officers, Defendant dropped the satchel on the sidewalk not far from one of the homes on Midwood Avenue. Nearly immediately thereafter, one of the officers, Det. Leak, recovered the satchel and immediately felt the barrel of the firearm inside the bag. Seconds after that, the officers pursuing Defendant caught up to him, detained him, and put him in handcuffs near the driveway of the residence next door to the residence where Defendant had dropped the satchel.

One of the officers stated upon detaining Defendant that, "he dropped his satchel back

---

[2] Such satchels were familiar to the officers who, based on their training and experience, understood that satchels are common places for individuals to store firearms inasmuch as they can provide easy access to the firearm, while at the same time are easy to discard.

Page 4 of 18

there." Another officer told him, "We got it; we got it,"—confirming that Det. Leak had recovered the bag.

After the recovering the satchel, Det. quickly took it back to the police car and opened it—confirming the presence of a firearm and suspected drugs in the bag. Defendant was brought to the area of the police car and searched. On his person, law enforcement recovered $279 in U.S. currency and suspected marijuana. Defendant had no identification on his person and initially refused to provide law enforcement basic identifying information about himself. Defendant eventually did so, providing his name, address, and date of birth in response to questions from the officers. He was eventually transported to Central Booking. He was not interviewed.

The satchel dropped by Defendant was eventually searched more thoroughly. It contained a loaded blue Ruger firearm—identical in appearance to the one used by Defendant in connection with the robberies that he had committed just days earlier. Law enforcement also recovered from within the satchel a medicine bottle containing 7 blue baggies of a white rock substance (suspected cocaine), and a black drawstring bag containing the following: (1) a plastic bag containing a white rock substance (suspected cocaine); (2) 55 gel capsules of white powder (suspected heroin); (3) three green Ziploc baggies of white rock substance (suspected cocaine); (4) 3 pink jugs of white rock substance (suspected cocaine); and (5) four ziplock baggies containing a white rock substance (suspected cocaine).[3]

Photographs of the items recovered by law enforcement are below.

---

[3] Later obtained lab results confirmed that all of these items, except the 55 gel caps, were in fact controlled dangerous substances—cocaine.



It is also of this evidence that Defendant would have the Court suppress.

## IV. Search Warrant For New Balance Sneakers, DNA, And Google Account.

At the time of his arrest on August 8, 2020, Defendant was wearing New Balance brand sneakers substantially identical in appearance to the ones he wore during the robbery of the Royal Farms store located at 3701 Fleet Street Baltimore, Maryland 21224. Thus, law enforcement on September 4, 2020 obtained a state warrant authorizing the seizure of the shoes from Defendant at the detention center and executed the warrant. Ex. 1

On October 8, 2020, law enforcement obtained a federal warrant authorizing the search of, among other things, Defendant's person for two oral buccal DNA swabs, Ex. 2, which they executed. On May 21, 2021, law enforcement obtained a federal warrant authorizing a search of various electronic accounts, including a Google account belonging to Defendant— wessonbilly9@gmail.com, Ex. 3, which was executed as well.

## PROCEDURAL HISTORY

On September 30, 2019, a Grand Jury sitting in the District of Maryland returned an eight count Indictment charging Defendant with: (1) three counts of Hobbs Act Robbery in violation of 18 U.S.C. § 1951(a) (Counts One, Three, Five); (2) three counts of Brandishing a Firearm During

a Crime of Violence in violation of 18 U.S.C. § 924(c)(1)(A)(ii) (Counts Two, Four, and Six); (3) one count of Possession With Intent to Distribute Controlled Substances, in violation of 21 U.S.C. § 841(a)(1); and (4) one count of Possession of a Firearm in Furtherance of a Drug Trafficking Crime in violation of 18 U.S.C. § 924(c).

On April 1, 2022, Defendant filed various pre-trial motions, which are summarized in the following chart:

| MOTION | ECF. # |
|---|---|
| Motion For Leave to File Additional Motions[4] | 28 |
| Motion To Suppress Evidence From Searches and Seizures on November 29, 2019[5] | 29 |
| Motion To Suppress Evidence Obtained on August 8, 2020 | 30 |
| Motion to Suppress Statements | 31 |
| Motion To Suppress Evidence Seized in Connection With Warrants | 32 |

A motions hearing is scheduled for May 26, 2022 at 11:00 a.m. and a jury trial is scheduled for October 17, 2022.

## ARGUMENT

All of Defendant's motions are either meritless or moot, and therefore the Court should deny them.

**I.   The Motion To Suppress Evidence Seized By Law Enforcment on August 8, 2020 (ECF No. 30) Should Be Denied.**

Defendant first seeks suppress evidence seized by law enforcement on August 8, 2020. ECF No. 30.  The Court can easily reject this motion.  Upon seeing the law enforcement officers get out of their car, Defendant fled and abandoned a satchel containing the firearm he had used in connection with the robberies at issue in this case (and drugs) before being caught by law

---

[4] Defendant has filed a motion for leave to file additional motions. The Government does not object at this time, but reserves the right to object to the filing of additional defense motions in the future, to the extent that they endanger the scheduled trial date.

[5] The Government does not intend to introduce evidence from the November 29, 2019 searches and seizures at trial.  This motion can therefore be denied as moot.

enforcement. Defendant thus has no standing to challenge the seizure of the items. Moreover, after the satchel was recovered by law enforcement and the firearm and drugs discovered, there was more than ample probable cause to arrest Defendant and to search him incident to his arrest.

### A. The Pursuit Of Defendant Did Not Constitute A *Terry* Stop.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures." U.S. Const. amend. IV. This guarantee, however, "does not extend to all police-citizen encounters." *United States v. Jones*, 678 F.3d 293, 298–99 (4th Cir. 2012). As a general matter, law enforcement officers do not seize individuals "merely by approaching [them] on the street or in other public places and putting questions to them." *United States v. Drayton*, 536 U.S. 194, 200 (2002). Rather, a "seizure," the Supreme Court recently affirmed, occurs when officers employ "'physical force' or a 'show of authority' that 'in some way restrain[s] the liberty' of the person." *Torres v. Madrid*, —— U.S. ——, 141 S. Ct. 989, 995 (2021) (alteration in original) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)).

Where, as here, physical force is absent, a seizure requires both a "show of authority" from law enforcement officers and "submission to the assertion of authority" by the defendant. *California v. Hodari D.*, 499 U.S. 621, 626 (1991).[6] Flight from the police, of course, does not constitute submission to the assertion of authority—just the opposite. *Id.* (reversing suppression of drugs thrown by suspect fleeing suspect because he was running, not submitting to authority, when he discarded the drugs, which were abandoned); *see also United States v. Cloud*, 994 F.3d

---

[6] In *Hodari D.*, two officers on patrol came across a group of four or five youths huddled around a car parked at the curb. *Id.* at 623. The youths saw the officers' car approach, and the group dispersed. *Id.* One officer pursued a suspect on foot, and the second officer followed in the patrol car. *Id.* Before the defendant was caught, he "tossed away what appeared to be a small rock." *Id.* Officers eventually tackled the defendant and recovered the rock, which was later determined to be crack cocaine. *Id.* The Supreme Court assumed that the officers' pursuit "constituted a 'show of authority' enjoining [the defendant] to halt," but the defendant "did not comply with that injunction [and therefore] was not seized until he was tackled." *Id.* at 629.

233, 242 (4th Cir. 2021) ("That officers employed a show of authority does not alone implicate the Fourth Amendment. . . .  For a seizure to occur, the [individual] must actually submit to that show of authority."); *United States v. Stover*, 808 F.3d 991, 1000–01 (4th Cir. 2015) ("Since Stover did not accede to police authority until confronted by an armed officer in front of the Silverado, the gun he discarded prior to that time was not the fruit of the seizure, but rather, like the cocaine in *Hodari D.*, was abandoned."); *United States v. Coley*, 464 F. Supp. 2d 487 (D. Md. 2006) (defendant never submitted to the detectives' show of authority and was fleeing when he discarded the gun).  Indeed, "without actual submission to the police, there is at most an attempted seizure, which is not subject to Fourth Amendment protection." *Hodari D.*, 499 U.S. at 628-29.

Here, Defendant fled law enforcement immediately upon seeing them get out of their car.  Only after he dropped the satchel and later was physically apprehended by law enforcement was Defendant seized for Fourth Amendment purposes.  Accordingly, no *Terry* stop ever occurred, and the Court need not even analyze whether the officers had a reasonable suspicion that criminal activity may have been afoot.  *See Terry*, 392 U.S. at 30; *Hodari D.*, 499 U.S. at 629.[7]

### B. Defendant Abandoned The Satchel Containing The Firearm And Drugs Prior To His Seizure, And He Is Therefore Precluded From Seeking Their Suppression.

Defendant abandoned the satchel containing the firearm and drugs, as well as any privacy interest he may have had in them, before he, the satchel or its contents was seized, and so he has no standing to seek their suppression.

The purpose of the exclusionary rule is to "effectuate the guarantees of the Fourth Amendment." *Rakas v. Illinois*, 439 U.S. 128, 134 (1978).  Only a defendant whose own Fourth

---

[7] Even if *Terry* did apply—and it does not—law enforcement would have been justified in conducting a *Terry* stop and frisk in light of, among other things, (1) Defendant's presence in a high crime area at night; (2) his conducting a security check on the satchel he carried; (3) law enforcement's knowledge that satchels are frequently used to carry firearms and drugs; and (4) Defendant's headlong flight from police upon seeing them.

Amendment rights have been violated may benefit from the protections of the exclusionary rule. *Id.* As a result, a defendant may assert a violation of the Fourth Amendment only if he had a "legitimate expectation of privacy" in the place that was searched or the property that was seized. *Id.* at 143 (citing *Katz v. United States*, 389 U.S. 347, 353 (1967)). "When a person voluntarily abandons his privacy interest in property, his subjective expectation of privacy becomes unreasonable, and he is precluded from seeking to suppress evidence seized from it." *United States v. Stevenson*, 396 F.3d 538, 546 (4th Cir. 2005) (citing *United States v. Leshuk*, 65 F.3d 1105, 1111 (4th Cir. 1995)); *see also United States v. Davis*, 657 F. Supp. 2d 630, 647-48 (D. Md. 2009) ("It is well established that the warrantless search of abandoned property is not unreasonable and therefore does not violate the Fourth Amendment.").

The evaluation of whether the defendant intended to abandon his property is based on an objective analysis of act and intent, which intent may be inferred from "words spoken, acts done, and other objective facts." *United States v. Small*, 944 F.3d 490, 502 (4th Cir. 2019). Conducting such analysis, courts consistently find abandonment in circumstances such as the one here. *See, e.g.*, *Hodari D.*, 499 U.S. at 629; *United States v. Green*, 415 F. App'x 451, 452 (4th Cir. 2011) (concluding that the firearm abandoned by the defendant prior to his seizure was not subject to suppression); *United States v. Simmons*, 437 F. App'x 215, 220 (4th Cir. 2011) (concluding that when the defendant discarded a firearm while running from the police, he "abandoned any residual expectation of privacy he may have harbored in respect to his possession of the firearm").

In *Hodari D.*, the defendant abandoned the suspected crack cocaine prior to submitting to the officers' show of authority. 499 U.S. at 629. Because the defendant abandoned the contraband before he was seized, the Supreme Court concluded that the contraband was "not the fruit of a seizure" and it could not be suppressed. *Id.* The Fourth Circuit's decision in *United States v. Cureton*, 367 F. App'x 434 (4th Cir. 2010) is also instructive. There, an officer asked to speak

with the defendant. *Id.* at 436. The defendant refused and then fled. *Id.* The officer pursued the defendant on foot and yelled for him to stop, but the defendant continued running. *Id.* During the pursuit, the officer saw the defendant reach into the waistband of his pants and grip an object as if he were "gripping the handle of a pistol." *Id.* The defendant then ran around the corner of a building. *Id.* The officer eventually found the defendant in a nearby parking lot hiding under a truck, and the officer arrested him. *Id.* Officers later found a handgun under another truck in the lot. *Id.*  The defendant moved to suppress the firearm. *Id.* at 436. The district court denied the defendant's motion; the Fourth Court affirmed, reasoning that "[a] defendant who flees the police in response to an assertion of authority has not been seized, and thus his Fourth Amendment rights are not implicated." *Id.* at 437 (citing *Hodari D.*, 499 U.S. at 629).  The Fourth Circuit concluded that, like the defendant in *Hodari D.*, the defendant "was not seized before or during his flight," and so the defendant "had not been seized at the time he abandoned the handgun." *Id.* at 437-38.

Here, as in *Hodari D.* and *Cureton*, Defendant fled immediately after seeing the officers begin to get out of the vehicle.  Assuming—as the Supreme Court did in *Hodari D.*—that the police pursuit of Defendant was a show of authority enjoining Defendant to stop, Defendant did not submit to that show of authority.  Instead, Defendant fled from the officers and was observed dropping the satchel containing the firearm and drugs during his flight—just a short distance from where Defendant ultimately caught by law enforcement.  By abandoning the firearm before he was seized, Defendant abandoned any reasonable expectation of privacy he may have had in the satchel and its contents—the firearm and drugs.  Defendant thus has no standing to challenge the seizure of the firearm and ammunition, and his motion to suppress those items should be denied.

### C. The Officers Had Probable Cause To Arrest Defendant.

Defendant was not seized until he was caught by pursuing officers and detained.  Before Defendant was detained, the satchel containing the firearm and drugs was recovered by Det. Leak,

and Det. Leak felt the firearm in the satchel. Shortly after Defendant's detention, Det. Leak opened the satchel and saw the firearm and suspected drugs. Because the officers had probable cause to believe that Defendant had committed or was committing a crime, the arrest of Defendant was proper.

An officer may make a warrantless arrest in public when the arrest is supported by probable cause. *See Maryland v. Pringle*, 540 U.S. 366, 370 (2003); *United States v. Watson*, 423 U.S. 411, 416-24 (1976). The probable cause standard is a nontechnical, common sense standard "incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances." *Pringle*, 540 U.S. at 371. Probable cause to justify an arrest exists when the "facts and circumstances within the officer's knowledge … are sufficient to warrant a prudent person . . . in believing . . . that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979).

In assessing the totality of the circumstances, officers may draw from their practical experiences and may consider, among other things, "an individual's presence in a high-crime area coupled with his '[h]eadlong flight' upon noticing police." *United States v. Humphries*, 372 F.3d 653, 657 (4th Cir. 2004) (internal citation omitted).[8] "[D]eliberately furtive actions and flight at the approach of strangers or law officers are strong indicia of mens rea" and "are proper factors to be considered in the decision to make an arrest." *Sibron v. New York*, 392 U.S. 40, 66-67 (1968); *see also United States v. Powell*, 886 F.2d 81, 83-84 (4th Cir. 1989) (suspect's attempted flight from officers helped create probable cause for an arrest). Moreover, a suspect conducting a "security check" is a relevant factor in the analysis too. *See United States v. Humphries*, 372 F.3d 653, 660 (4th Cir. 2004) (finding officers had probable cause to arrest defendant because he was

---

[8] "The lateness of the hour is . . . [a] fact that may raise the level of suspicion." *United States v. Lender,* 985 F.2d 151, 154 (4th Cir. 1993).

located in a high-crime area, smelled of marijuana, and patted his waist area, interpreted by officers to be a "security check"—"an instinctive check by [a suspect] to see that his weapon was in place").

Here, the facts and circumstances within the knowledge of the arresting officers gave them probable cause to believe Defendant had committed a crime. The arresting officers were patrolling the 5100 block of Midwood Avenue, a high-crime area, at almost 11 PM in the evening when they saw Defendant conduct a security check—an instinctual movement to check the security of a concealed firearm—on a satchel in his possession. They also knew from their training and experience that satchels are frequently used to carry firearms and, at times, drugs. As the officers got out of their unmarked vehicle, Defendant saw them and immediately ran. As he fled, Defendant dropped his satchel. It was almost immediately recovered by Det. Leak who felt the firearm within the bag. Moments after that, Defendant was apprehended by Dets. Wagner, Tabron, and Klocko, handcuffed,[9] and detained. Shortly after that, Det. Leak opened the satchel, seeing the firearm and drugs.

The facts and circumstances here were more than sufficient to warrant the officers' belief that Defendant had committed a crime—including possession with intent to distribute controlled dangerous substances in violation of MD. Code Ann. 5-602(2) and possession of a firearm during and in relation to a drug trafficking crime in violation of MD. Code Ann. 5-621, and so the officers had probable cause to arrest Defendant. Law enforcement also learned that Defendant was prohibited from possessing firearms—still another reasoning justifying his arrest.

---

[9] It is well established in this circuit that "handcuffing a suspect ... does not necessarily elevate a lawful [Terry] stop into a custodial arrest." *United States v. Elston*, 479 F.3d 314, 320 (4th Cir. 2007) (internal quotation marks omitted). This is because "[b]rief, even if complete, deprivations of a suspect's liberty do not convert a stop and frisk into an arrest so long as the methods of restraint used are reasonable to the circumstances." *United States v. Crittendon*, 883 F.2d 326, 329 (4th Cir. 1989). In particular, the reasonableness of handcuffing a suspect during a Terry stop depends on whether doing so is "necessary to maintain the status quo and protect [officer] safety." *Id.* (internal quotation marks omitted).

Incident to a lawful arrest, officers may conduct a full search of the arrestee, regardless of whether he is suspected of possessing weapons or evidence pertaining to the offense for which he is being arrested. *United States v. Robinson*, 414 U.S. 218, 234-35 (1973). Here, incident to Defendant's lawful arrest, officers conducted a search of Defendant's pockets and recovered $279 in U.S. currency and a paper towel containing green plant material that resembled marijuana. Because these items were properly seized during a search incident to a lawful arrest, Defendant's motion to suppress these items should be denied too.

**II.     The Motion To Suppress Statements (ECF No. 31) Should Be Denied.**

Defendant also moves to suppress statements made by Defendant on the evening of August 8, 2020 after his detention and arrest. Defendant notes that "officers asked Mr. Wesson several questions without instructing him as to his Miranda rights. Mr. Wesson provided brief answers." ECF No. 31 at 1. But none of the statements Defendant made are subject to *Miranda*. Indeed, the questions the officers asked all pertained to who Mr. Wesson is—his name, date of birth, and his address. Defendant had no identification on him and, for a time, refused to even provide law enforcement with his name.

All of the information provided by Defendant—his name, date of birth, and address—falls within the routine booking exception to *Miranda*. *See United States v. D'Anjou*, 16 F.3d 604, 608 (4th Cir. 1994) ("[T]here exists an exception to Miranda's coverage for routine booking questions securing 'biographical data necessary to complete booking or pretrial services,'") (quoting *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (plurality opinion)); *see also United States v. Brown*, No. GJH-18-0335, 2020 WL 6393392, at *9 (D. Md. Nov. 2, 2020) (address provided by defendant pre-*Miranda* fell within booking exception). Accordingly, the Court should deny Defendant's motion to suppress these statements.

**III.     Motion to Suppress Evidence Seized In Connection To Search Warrants (ECF No. 32).**

Defendant next seeks to suppress "all evidence and derivative evidence seized pursuant to search warrants in this case." ECF No. 32 at 1. Defendant points to the warrants authorizing the seizure of Defendant's sneakers, Ex. 1, his DNA, Ex. 2, and his Google account, Ex. 3. ECF No. 32 at 1.

Defendant first asserts that the affidavits underlying the warrants identified above were not supported by probable cause. ECF No. 32 at 1. But Defendant does not point to any specific deficiency or defect in any of the warrants. This is unsurprising, because each of these warrants was facially valid, supported by ample probable cause, and issued by a neutral magistrate. The evidence seized pursuant to these warrants should not be suppressed.

> In reviewing a search warrant application, a magistrate must make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . , including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Illinois v. Gates*, 462 U.S. 213, 238 (1983). "To begin with, warrant affidavits are normally drafted by nonlawyers in the midst and haste of a criminal investigation." *United States v. Clenney*, 631 F.3d 658, 665 (4th Cir. 2011) (internal citation and quotation marks omitted). A court reviewing a magistrate judge's assessment of probable cause must accord his or her decision "great deference," and should not "invalidate a warrant 'by interpreting [an] affidavi[t] in a hypertechnical, rather than a commonsense, manner.'" *United States v. Lalor*, 996 F.2d 1578, 1581 (4th Cir.), cert. denied, 510 U.S. 983 (1993) (quoting *Gates*, 462 U.S. at 236). "So long as the magistrate had a 'substantial basis for . . . conclud[ing]' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." *Gates*, 462 U.S. at 236 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)).

A commonsense reading of each of the affidavits in this case demonstrates that they were all supported by probable cause. The affidavits set forth the facts of the investigation in detail, tying each of the locations to be searched to specific information obtained in connection with the investigation of the robberies. Each warrant also describes with particularity the place to be searched and the evidence to be seized.[10]

In any event, even if the affidavits in support of the warrants did not establish probable cause—and they do—suppression would still be unwarranted because the good faith exception applies. Indeed, the Supreme Court has held that when officers seize evidence in good faith reliance on a facially valid warrant issued by a magistrate or judge, and the affidavit is later found to lack probable cause, the evidence is not subject to the exclusionary rule of the Fourth Amendment and is admissible in the government's case-in-chief. *United States v. Leon*, 468 U.S. 897 (1984) (affidavit of experienced narcotics officer who acted in reliance on information provided by informant of "unproven reliability" held to lack probable cause, but evidence seized by agent who acted in good faith reliance on the facially valid warrant was not subject to suppression).

The Fourth Circuit has held that the good faith exception applies to otherwise deficient search warrants except in "egregious cases" such as "when 'the issuing magistrate wholly abandon[s] his judicial role' or when the warrant issued is 'so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid.'" *United States v. Qazah*, 810 F.3d 879, 886-87 (4th

---

[10] Indeed, where a warrant identifies the crimes at issue and limits the search for evidence relating to those crimes, courts, including the Fourth Circuit, have consistently found that the particularity requirement has been satisfied. *See, e.g.*, *United States v. Williams*, 592 F.3d 511 (4th Cir. 2010) ("The particularity requirement is fulfilled when the warrant identifies the items to be seized by their relation to designated crimes and when the description of the items leaves nothing to the discretion of the officer executing the warrant.").

Cir. 2015) (quoting *Leon*, 468 U.S. at 922-23)).  The court also held that "in the ordinary course, the exclusion of evidence is not the proper remedy."  *Id.*

The good-faith exception applies in most cases, except those where the affidavit provides only minimal, vague information.  *Cf. United States v. Wilhelm*, 80 F.3d 116, 121 (4th Cir. 1996) ("We find that the good-faith exception to the exclusionary rule should not apply in this case due to the 'bare bones' nature of the affidavit[.]").  Indeed, "[s]earches pursuant to a warrant . . . rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search."  *United States v. Legg*, 18 F.3d 240, 243 (4th Cir. 1994) (internal quotation marks omitted).

No such "egregious" circumstances or "minimal, vague information" are present here.  No aspect of the affidavits or warrants were deficient and it was not unreasonable for law enforcement to rely in good faith on them.  Indeed, the facts in each affidavit clearly establish probable cause that evidence related to the robberies will be found at the locations to be searched.  Defendant does not establish, or even allege, any grounds on which the supposed deficiencies of the warrants render officers' reliance on the warrants objectively unreasonable, and in fact does not address the good faith exception at all.

Because the warrants were all supported by probable cause and the officers acted in good faith in securing and executing them the motions to suppress should be denied.

**V.     CONCLUSION**

For all of the above reasons, Defendants' motions should be denied.

                Respectfully submitted,

                EREK L. BARRON
                United States Attorney

By:   /s/
                Paul Riley
                Colleen McGuinn
                Assistant United States Attorneys
                36 S. Charles Street, 4th Fl.
                Baltimore, Maryland 21201