UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND

| | : | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | Criminal No. CCB-21-0398 |
| | : | |
| **BILLY WESSON** | : | |
| | : | |

## DEFENSE REPLY TO GOVERNMENT'S CONSOLIDATED RESPONSE TO MOTIONS TO SUPPRESS

Mr. Wesson, through counsel, hereby replies to the Government's consolidated response to Mr. Wesson's suppression motions.

Following additional discovery disclosures and the Government's consolidated response, the Defense submits on the following motions:

1) <u>Motion to Suppress Evidence From Searches and Seizures on November 29, 2019 (ECF No. 29):</u> Since the Government does not intend to introduce evidence from the November 29, 2019 searches and seizures, the Defense agrees that motion is now moot. *See* Gov. Resp. ECF No. 33 at 7, n.5.

2) <u>Motion to Suppress Statements (ECF No. 31):</u> To the extent that the Government only seeks to introduce the information provided on August 8, 2020 by Mr. Wesson pertaining to "his name date of birth and address," the Defense agrees that this information falls within the routine booking exception to *Miranda* and therefore withdraws the Motion to Suppress Statements. Gov. Resp. at 14.

3) <u>Motion to Suppress Evidence Seized in Connection With Warrants (ECF No. 32):</u> Following receipt of additional discovery, the Defense withdraws the Motion to Suppress Evidence Seized in Connection with Warrants.

1

The Defense proceeds on the Motion to Suppress Evidence Obtained on August 8, 2020 (ECF No. 30). In addition to this filing, the Defense moves to supplement argument following the evidentiary portion of the May 26, 2022 hearing.

### A. The Government has not established that Mr. Wesson voluntarily abandoned the satchel.

The Government argues (1) that officers' detention of Mr. Wesson was proper because, before he was detained, Detective Leak recovered Mr. Wesson's satchel and felt a firearm inside, and (2) that the subsequent arrest of Mr. Wesson was supported by probable cause because, shortly after Mr. Wesson's detention, Detective Leak opened the satchel and discovered a firearm and drugs. *See* ECF No. 33 at 11-12. According to the Government, Detective Leak could lawfully retrieve and open the satchel because Mr. Wesson abandoned it while running from police. ECF No. 33 at 9-11. But the Government has failed to establish the factual predicate necessary for a finding of abandonment.

"Although warrantless searches are generally considered *per se* unreasonable under the Fourth Amendment, this generality is subject to a few specifically established and well-delineated exceptions." *United States v. Small*, 944 F.3d 490, 501 (4th Cir. 2019). Abandonment is one such exception. Generally, the "capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *United States v. Ferebee*, 957 F.3d 406, 412 (4th Cir. 2020). But when someone "voluntarily abandons property," he "loses any reasonable expectation of privacy in the property and is consequently precluded from seeking to suppress evidence seized from the property." Id.

The Government bears the burden of proving a defendant has abandoned property. *United States v. James*, 353 F.3d 606, 616 (8th Cir. 2003) ("At the suppression hearing, the

Government bore the burden of establishing that Mr. James had abandoned the discs."); *United States v. Denny*, 441 F.3d 1220, 1226 (10th Cir. 2006) ("[T]he burden is on the Government to establish abandonment by a preponderance of the evidence."); *see also Small*, 944 F.3d at 502 (noting, in context of abandonment challenge, that "[t]he Government bears the burden of proving the admissibility of evidence obtained pursuant to a warrantless search by a preponderance of evidence"). To carry its burden, the Government must show the defendant had an "inten[t] to abandon" an item. *Small*, 944 F.3d at 502. As the Government recognizes, the question in abandonment cases is "whether the defendant intended to abandon his property," ECF No. 33 at 10—not whether he merely lost possession of it. There must be "some voluntary aspect to the circumstances that lead to [abandonment]," *id.* at 503, and so the "abandonment inquiry focuses solely on the intent of the defendant," *Ferebee*, 957 F.3d at 413; *accord United States v. Stevenson*, 396 F.3d 538, 546 (4th Cir. 2005) ("When a person *voluntarily* abandons his privacy interest in property, his subjective expectation of privacy becomes unreasonable." (emphasis added)).

The abandonment inquiry employs "an objective analysis which considers the defendant's actions and intentions." *Small*, 944 F.3d at 502. A defendant's "[i]ntent to abandon may be inferred from words spoken, acts done, and other objective facts." *Id.*

Here, the Government has not demonstrated that Mr. Wesson *intended* to "disassociat[e] himself" from the satchel. *Ferebee*, 957 F.3d at 413. The body-worn camera footage produced in discovery does not capture Mr. Wesson supposedly discarding the satchel. Thus the record gives no indication that Mr. Wesson threw the satchel to the ground intentionally, rather than losing control over it accidentally. For all the discovery indicates, the satchel fell from Mr. Satchel's shoulder inadvertently during the commotion that arose when

3

officers exited their car. The Government has not borne its burden of showing Mr. Wesson abandoned the satchel. As a result, Detective Leak's manipulation of the bag and his visual inspection of its contents cannot contribute to reasonable suspicion or probable cause.

> **B. Mr. Wesson's flight from police does not support reasonable suspicion or probable cause.**

Mr. Wesson was arrested, for Fourth Amendment purposes, when officers caught up to him, detained him while he was on the ground, and placed handcuffs on him. The Government contends officers had probable cause to arrest Mr. Wesson at that point based, in part, on his "presence in a high crime area at night" and his "headlong flight from police upon seeing them." *See* ECF No. 33 at 9 n.7. In *Illinois v. Wardlow*, 528 U.S. 119, 121, 124 (2000), the Supreme Court held police have reasonable suspicion to conduct a *Terry* stop if a suspect engages in "unprovoked flight upon noticing the police" while in "an area known for heavy narcotics trafficking." But as with abandonment, the record does not establish the presence of these factors.

*Wardlow* made clear it is "unprovoked" flight that is relevant to the reasonable suspicion analysis. *Id.* at 125 ("[A]ny refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure. But *unprovoked* flight is simply not a mere refusal to cooperate." (emphasis added)); *id.* at 123 n.1 ("The state courts have differed on whether *unprovoked* flight is sufficient grounds to constitute reasonable suspicion." (emphasis added)). Following *Wardlow*, courts have recognized flight does not contribute to reasonable suspicion if it is "provoked" by police conduct. Police officers, in other words, "cannot improperly provoke . . . a person into fleeing and use the flight to justify a stop." *United States v. Rodella*, 804 F.3d 1317, 1326 (10th Cir. 2015).

Although the law on provoked flight "is far from developed," a number of courts have concluded officers provoke flight by "put[ting] a defendant in reasonable fear of physical harm." *United States v. Jeter*, 721 F.3d 746, 753-54 (6th Cir. 2013); *see also Rodella*, 804 F.3d at 1326 (holding police officer "provoked [suspect] into panicking and fleeing for his safety" where officer "placed [suspect] in reasonable fear of physical harm"); *Marshall ex rel. Gossens v. Teske*, 284 F.3d 765, 771 (7th Cir. 2002) (explaining suspect's "flight was not unprovoked" because fleeing was the "sane" and reasonable response to encountering masked men with guns). If police "d[o] not converge upon, surround, or even approach the defendant before he r[uns]," then flight is unprovoked. *Jeter*, 721 F.3d at 753-54. But where police engage in "something more," such as "merely making contact with the defendant before flight," then his flight may be provoked. *Id.* at 754 (citing *Wardlow*, 528 U.S. at 125).

The body-worn camera footage in this case suggests Mr. Wesson may have fled because he was in reasonable fear of physical harm. The footage indicates Mr. Wesson began to run when four men he did not know got out of an unmarked car on a dark street and one of them immediately began sprinting directly toward him. Confronted by an unknown man barreling at him full speed, a reasonable person might well conclude he should "run . . . for fear of imminent danger." *Id.* In such circumstances, flight is provoked and therefore adds nothing to reasonable suspicion or probable cause.

In addition, *Wardlow* held only that "a defendant's flight upon seeing a police car *in a high-crime area* was enough to create a reasonable suspicion of criminal activity sufficient to justify a *Terry* stop." *United States v. Bumpers*, 705 F.3d 168, 175 (4th Cir. 2013) (emphasis added). Courts have interpreted *Wardlow* to mean that unprovoked flight outside a high-crime area is insufficient to establish reasonable suspicion. *See, e.g.*, *United States v. Brown*, 925

F.3d 1150, 1155-56 (9th Cir. 2019) (distinguishing *Wardlow* and holding police acted illegally because, among other things, stop did not occur in "a 'high crime' area"); *United States v. Navedo*, 694 F.3d 463, 472 (3d Cir. 2012) ("We have explained that flight upon noticing police, *plus some other indicia of wrongdoing*, can constitute reasonable suspicion." (emphasis in original) (citing *Wardlow*)).

In Mr. Wesson's case, it is not clear police encountered him in a so-called high-crime area. Detective Leak wrote in his police report that the Winston-Govan neighborhood, where Mr. Wesson was arrested, "is home to numerous liquor and food establishments as well as numerous residential homes and a gas station, the latter of which is a known gathering spot for participants in the sale/distribution of illegally possessed narcotics." This activity, Detective Leak wrote, "has led to numerous CDS and firearm investigations in the area." While the gas station may qualify as a high-crime area, it does not appear from Detective Leak's report that the 5100 block of Midwood, where officers found Mr. Wesson, experiences higher-than-average crime rates. Even if Mr. Wesson's flight were unprovoked, therefore, it would not give police reasonable suspicion to detain him.

**C. The Government has conceded that all evidence from the car search on August 8, 2022 must be suppressed.**

The Defense moved to suppress all evidence seized from the August 8, 2020 warrantless searches of Mr. Wesson's person, the satchel/bag, and nearby vehicle. ECF No. 30. Discovery describes officer observations that on the night of his arrest, Mr. Wesson fled from the vehicle subsequently searched. The warrantless car search is captured on police body worn camera footage. The Government has not responded to the argument that evidence seized during the warrantless car search must be suppressed. ECF No. 33. Due to not responding, the Government has conceded that the evidence from the car search must be suppressed. *See*

6

*Aletum v. Adecco USA, Inc.*, No. CV GLR-20-703, 2021 WL 1530080, at *3 (D. Md. Apr. 19, 2021); *Vennie v. Maryland Transit Admin.*, No. CV ELH-19-03277, 2020 WL 4582713, at *1 (D. Md. Aug. 7, 2020).

Respectfully submitted,

JAMES WYDA
Federal Public Defender
 for the District of Maryland


              /s/
SEDIRA BANAN #804827
Assistant Federal Public Defender
100 South Charles Street
Tower II, 9th Floor
Baltimore, MD 21201
Phone: (410) 962-3692
Fax: (410) 962-3876
Email: sedira_banan@fd.org